Our first case today is 2022-40654. Velazquez plaintiff, Vendler Automotive, third-party plaintiff, Ruben de la Rosa Martinez, et al. defendants, and Allied Plastics third-party defendants. Mr. Knight, you may proceed. May it please the court, Nolan Knight here on behalf of the Bentler Appellants. The Bentler Appellants respectfully request that this court reverse the lower court's summary judgment disposition, which was premised on the lower court's construction of the term as defined in Chapter 82 of the Texas Civil Practice and Remedies Code. To begin, in Amazon.com v. McMillan, the Texas Supreme Court, in response to a certified question from this court, clarified that the term seller includes both ordinary sale transactions as well as non-sale transactions. This dispute is within the non-sale transactional framework, and the Bentler Appellants in their briefing have emphasized two principal points as to why within that framework they qualify as Chapter 82 sellers. First, the plain language of the statutory text, which is where we logically should begin, whereas the appellees attempt to frustrate the purpose of the statutory text by overlaying inapplicable common law principles. The second thing that the Bentler Appellants have done is to emphasize the statutory objective of the Chapter 82 scheme, which is to shift responsibility from product defects from intermediate commercial actors back to the persons with whom the liability rightfully should reside, which are the manufacturers. So text was your first argument, and then you said two. The second is that they are being purposivist or something, but is that is that your second argument? I'm trying to just make sure I have it. Yes, the construction of the statutory language is what serves the policy objectives of the Chapter 82 scheme, whereas the appellant's construction frustrates that policy objective. So today I want to focus on the plain language of the statutory text, take up policy considerations to the extent that it may be beneficial to the panel, but I also want to talk in some detail about the rebuttal contentions that have been advanced by the appellees, because what is clear from reading Texas jurisprudence is that none of the appellees' rebuttal contentions are novel or original. Functionally equivalent contentions were asserted in two of the three, what I consider, major Texas court rulings, but only the dissents in those cases embrace that reasoning. The majority in those cases, after considering these types of arguments, concluded they are not accurate reflections of Texas law. Can you explain exactly what you believed? I mean, do you believe that there's a transfer of these items, these containers? What exactly do you say happens? I thought they just pack them and then they send them back. That is true. The terms were used to bracket the rear action assemblies. The rear action assemblies are distributed in the conventional sense, and that's one of the axles, but not the terminals. That is correct, but that is the importance of a disjunctive language in the definition of seller, where it says distribute or otherwise place for any commercial purpose in the stream of commerce. How are these placed in commerce? They're in a closed loop. Well, they're typically used, the closed loop concept, as we briefly take issue with, because they're two different corporate entities with two different corporate identities who are passing the thermos back and forth. Who owns the thermos? Bentler Automotive. The one in South Carolina? That's correct. And so the one in Bentler, Mexico, uses the thermos to send the axles to Bentler Automotive. That is correct. Bentler Automotive sends it back to Bentler, Mexico. That is correct. And the cycle repeats itself. That is correct. How is that ever in stream of commerce? Because their essential use is to facilitate the distribution of the rear axle assemblies, and there is no dispute by the appellees that the rear axle assemblies are moving through the stream of commerce and, in fact, would qualify. But sure, those are, those go into cars, and the cars are eventually sold to also, I mean, I guess the BMW and then to end users, consumers, but the thermos aren't. That's correct. But let me emphasize the statutory text. And then if I could textualize this by making reference in particular to the Texas Supreme Court's opinion in Fitzgerald, which I think will highlight the import of how the statute is not narrowly construed to apply to only distribution. But let me start with the statutory text. The statutory text says a seller means a person who's engaged in the business of distributing or otherwise placing. On that point, this disjunctive is important because whereas the rear axle assemblies unquestionably were being distributed, if this term otherwise placing is going to have any independent effect, this is a paradigmatic example of how you could otherwise be placing a product in the stream of commerce, although you are not distributing the defective product. Because the thermos, they're used, quote, unquote. There's nobody's use. They weren't being used for an essential business purpose. They were being used for the essential business purpose to move the rear axle assemblies through the stream of commerce. So that was... Neither company's business was selling thermos. I agree with that, Your Honor. I mean, doesn't the case law pretty much say that you have, it has to kind of be your business buying and selling these things? No, I don't think that the case law says your business has to be selling the defective product. It can be any commercial purpose. That's what the statutory text says. So you've got distributing or otherwise placing and any commercial purpose. So if any commercial purpose is anything, we can't say the commercial purpose has to be distributed. What if it's a machine in your factory? It's part of your manufacturing process, but it's never delivered to the end consumer. I think that's a much more difficult case. Why is this case different? Because this product was operating in a way that is a functional equivalent of how other products moving through commerce create a risk to the public. And literally on these facts, because the thermos with the rear axle assemblies moving through the... What do you mean by risk to the public? A defective machine in the factory can also be very risky. But it's not being... One of the conditions to qualify as a seller who can seek indemnity is that the seller had to have placed the product in the stream of commerce. There has to be some way, and according to the statutory text... What is your definition of placing something in the stream of commerce? I think this case illustrates it. I don't mean whether this case satisfies it. What's the definition? What rule should we be using? One rule is stream of commerce means it's ending up in another person's hands. It's ending up in the consumer's hands. Correct. However, I also think that... That would defeat your position. What is your alternative definition that you propose to the court? If the defective product is being the plain language of the text. And Fitzgerald that I just made allusion to, I think is particularly helpful in that regard in two respects. One, because Fitzgerald gives us the model for applying the plain language doctrine to the actual definition of seller. But also because I think Fitzgerald is the most factually analogous case in Texas jurisprudence to the facts before this court. The panel may recall that Fitzgerald, Mr. Fitzgerald was sued in an underlying product action. But he had not had any connection whatsoever with the defective product. That's important because that means he didn't have title to it. He didn't relinquish title to it. He didn't introduce it into the stream of commerce. He didn't introduce it into the challenge of commerce. Fitzgerald did not do any of the things that the felonies in this case say are the absolute preconditions for a person to qualify as a seller. But after Mr. Fitzgerald, who had been wrongfully sued, was dismissed from the underlying product liability action, he then sought Chapter 82 indemnity. And so the question was, can he qualify as a person who introduced a product into the stream of commerce, although he did introduce the defective product, to seek Chapter 82 indemnity? The manufacturer defended, and Fitzgerald made the same types of arguments that the appellees are making. They said we should not look at the actual criteria for seller status in Section 82.0013. We should go to this Restatement Sector of Torts 428 and look at what the common law did with respect to various seller principles. So that was the issue. But don't the common law cases define seller very similarly to what the statute defines seller? In other words, isn't the definition in the statute based on the common law definition? Only in limited respects, we were talking about the transfer of title. And the Fitzgerald ruling speaks to that issue specifically. There are three things that the Fitzgerald court said that were flagged for this court. In analyzing whether a person did not sell the defective product could qualify as a seller. There's no transfer of title. Not here, nor in Fitzgerald, which is why I think Fitzgerald is so important. There was no transfer of title in Fitzgerald because Mr. Fitzgerald, he didn't have anything to do whatsoever with the product that injured. So he could not have facilitated the transfer of title because he never had title in the first place. He didn't sell the product. But on that issue, the Texas Supreme Court said at page 865 of Fitzgerald, the manufacturer argues that the legislature intended to deny identification to sellers who are not in the chain of distribution. That's what the appellees here continue. The manufacturer, quote, contends that the prior case law and legislative history demonstrate that the legislative purpose was to codify some aspects of our decisions and overrule others. So Judge Wilson, to your point, yes, there are some respects in which section 402A and the common law that evolved around it can inform some aspects. But on the question as to whether or not those common law principles are exclusive to the plain language of seller definition, the Texas Supreme Court tells us this. Case law does not directly address identification for sellers outside the chain of distribution. And we find nothing in the legislative history to cast doubt on the otherwise plain words of the statute. That common law jurisprudence does not address the non-sale transaction dynamic that we have here, where someone is using the defective product that they're not distributing, but they're using it in connection with a product that they are distributing. And just as the defective product moves through the stream of commerce to the consumer, they are otherwise placing here the thermals with the defective product to move through the stream of commerce. And we don't look at the common law, section 402A cases, to understand a non-distribution dynamic like this. We instead look at what the statute expressly says. And as I just mentioned a moment ago, the statute says seller means a person who's engaged in the business of distributing or otherwise placing for any commercial purpose. The commercial purpose here was that you could move the rear axle assemblies through commerce safely without using the thermals. And so you can't see that the rear axle assemblies unquestionably moving through commerce for a business purpose. And so I don't know that there's any logical way to try to cleave from that concession about the implications of the rear axle assemblies. What nobody disputes is the essential use of the thermals to facilitate that movement. Another thing I think is important, given the contentions that the appellees have made and some of the concerns that the panel may have, is that none of this is novel. The type of arguments that they are making to try to undermine the breadth of the definition of seller have been made before, have been considered by the Texas Supreme Court, and have been rejected. I mentioned that I think there are three cases that more than others inform the proper outcome of this case. Fish Darrow, which I've now talked about, New Texas Auto v. Daher Nambiz, which is another case in which the court made clear that the definition of seller under section 82 is broader than the meaning of seller in the common law context of 428. And of course, the other case, Amazon.com v. McMillan. What is particularly important about Fish Darrow and Amazon.com is not just the affirmative statement of law made by the in which they're articulating the same type of concerns that the appellees have raised, the same type of concerns that I think that the court is expressing some concern about, and feel that none of those concerns inform the proper understanding of the definition of seller. In my limited remaining opening time, I'll flag them for you, and I suspect there may be occasions to come back to some of those examples in the rebuttal, but one of the considerations that the dissent that Fitzgerald took up was a notion that distribution in some way was a sine qua non of seller status. Another consideration that the dissent that Fitzgerald took up was a notion that stream of commerce somehow carries with it an import that requires a retail type distribution of an effective product. I have a question. When did Fitzgerald become the central focus of this case? Because it's cited one time in your opening brief, and there are, you know, and of course the Amazon, you know, Amazon cited it a number of times. You know, the center point is passing. You know, you've got other cases that are the main cases. It's cited one time. It's okay. You cited it. You didn't weigh in or forfeit anything. I'm not critical. It's just, and then in your reply brief, you did come back harder on it, but with four sites, but it just did evolve that Fitzgerald would become the actor of the opening group was done that Fitzgerald would become the central focus of your argument. I don't think so. Your honor, I think that the delay was that I just read for the court. I think we actually put that verbatim in our opening. You did on page 13 of your opening brief. You did cite Fitzgerald. I just know you didn't waive anything. I'm just, it didn't seem to be the moving force of your case, but today it certainly is. I think that Fitzgerald made in conjunction with New Texas Auto and the Amazon.com ruling are pretty important to understand the operation. And so we cited them, we referenced them in the briefing in the way that we thought was logical, but I'm emphasizing Fitzgerald today, primarily because of the factually analogous nature of that case relative to these facts. And as I mentioned to the court, I read it to be the closest parallel to the record that this court has. And so for purposes of oral argument, I just thought it logical to perhaps emphasize that because it frames the issues so well. Thank you. What do you make of the fact that in Amazon, the non-selling entities are supposed to occupy a position equivalent to those who make sales? I think that that's what is reflected on this record. And it goes back to- These products you've already conceded don't ever end up in the hands of the end user. Well, I think that's what- How is that equivalent? I think that's what equivalent is trying to capture. Not the same. So equivalent doesn't mean identical because in that context, it would be a distribution. It'd be the classic ordinary sale context. So if the notion of a non-sale transaction wouldn't mean anything apart from the ordinary sale, equivalent can't mean that I'm retailing it- Okay. So what does it mean? I think this case illustrates it. If I am doing something with a product whereby it is introduced into the stream of commerce, whereby the risk to the public is function equivalent to a conventional distribution, the public policy of Texas is that we do not want that liability to ultimately land and stay with the intermediate commercial actor. We want the liability and the incentive to rest with the person who they should rest with. This is the main factor. So if it's an thermos, if it's an effective widget that's being distributed in a conventional sense, the public policy of Texas is to shift that responsibility away from the individual, back to the manufacturer. And I think that's accomplished with the equivalent nature of how the thermos would be used in a way that's function indistinguishable from how other products can move through commerce. If we did not agree that Fitzgerald is on all and controlling, would you want us to certify this? We're not opposed to having it certified. Not at all. We do think that Fitzgerald, in combination with New Texas Auto, that says the Chapter 82 definition is broader than 402A, and then Amazon clarifying here most recently that both ordinary sales and non-sales. We think in conjunction, the law of Texas is clear. Fitzgerald is, again, it's not an identical factual analog, but it's a post-factual analog, which gives us pretty clear direction on how the law, which is clear, should be applied for facts. But if the court were of the opinion that that was not the case, we certainly would not be opposed to certification. Okay, thank you. We'll save time for rebuttal. Mr. Upton. Good morning, Your Honors. May it please the Court. This Court should affirm the lower court's summary judgment and hold that the Bettler defendants are not sellers of the thermos shipping containers that are used for the sole purpose of moving auto parts from one plant to another before they are removed, disassembled, and sent back to the plant to begin again in that cyclical fashion. As our friends on the other side just agreed, the Bettler defendants are not engaged in the business of anything with the thermos. They are engaged in the business of auto parts. This case can end right there. Similarly, the Bettler defendants do not place the thermos into the stream of commerce as that term is understood by Chapter 82. Rather, the thermos are incidental to a larger business enterprise. Now, Amazon.com versus McMillan detailed the decades of Texas parts liability law. So what work does the placing part of the statute do in your view? Your Honor, that refers to putting that product into the stream of commerce here. The thermos... How is that different from distributing? Your Honor, we would contend that they're functionally equivalent in this situation. Distributing could be distributors placing the thermos, distributing could be putting the actual assemblies themselves, but here... But is there, just to make sure I understand your vision of the statute, does adding the phrase or otherwise placing add anything to the scope of the statute? Not with specific to this case. I'm not talking about this case. Is your view that basically or otherwise placing is permissible surplusage? I'm sorry, I missed the word. Permissible surplusage. It doesn't add anything, but that's fine. That's not misconstruing the statute. No, Your Honor, we don't contend it is misconstruing anything. Go ahead. Sorry. I would argue that it is not misconstruing anything or anything like that. I wouldn't go... But is it adding anything? It could in the right circumstance to capture the ways that certain products may be put into the stream of commerce there, not that it has to be just distributing. It may encompass something like an integral package, something like a Coke bottle or something like that. You'd be placing that Coke bottle, even if you're not the one who distributes it. But for this case, functionally, it doesn't make a difference here. That's why I say your point is even if you have somebody else, you may have been literal about Coke, you're the company, but you're not the distributor. Correct. It could be. Yes. Here, what matters is that overall business objective. And as Mr. Knight mentioned, that's not what we're doing here today. The terms are used simply to secure the auto parts during shipment. That's it. They are not an integral or intimately connected part of that product. That idea comes from the restatement for today. Combination says the two are purchased as an integrated whole. In those instances, the container cannot logically be separated from the contents when the two are sold as a unit. But here, when the method of securing something for transport is what the terms are used for, that is not something that the Bentley Defense are engaged in the business of doing. I think your theory on stream of commerce is it ends up in the hands of the end consumer. Yes, Your Honor, it is. But what's wrong with opposing counsel's theory that it could also be a bit more expansive to include the distributional process? In other words, this is not something that sits in the factory. It actually moves. It physically moves as part of the distribution process. Correct, Your Honor. It does physically move. However, there's a fundamental distinction between what the actual product is. The product that's being put into the stream of commerce is the actual assemblies. As Mr. Knapp was talking about earlier, the terms themselves are simply used. But can I assume that these products, the products in question cannot be moved without the thermos? It's an essential part of the process. Your Honor, we would argue that a different type of bracing or something could be... Okay, but you need something like this. Yes, Your Honor, to avoid them getting beat up or something in transit. These items cross international waters. Yes, Your Honor. Why isn't that stream of commerce? It's not stream of commerce because Bentley Automotive is the ultimate consumer of the thermos themselves and they own it the entire time. They never are releasing the interest or control in it. It is not reaching the ultimate public. It is separate from the actual assemblies themselves, which is what you are engaged in business of doing. You have to hit all three. You have to be distributor or otherwise placement. You have to be engaged in the business of, and you have to be putting that product into the stream of commerce. There's a little bit of a distinction. How often does this issue come up as far as you can tell outside of this case? Is this a common problem? I'm sort of getting to the certification question. Is this question important enough to send it to Texas Supreme Court? Your Honor, I would argue that this specific situation has not come up before that often. And I don't think you need to certify it here today because Amazon.com is very instructive on here's what the history of product liability law in Texas says. It relies on cases that hold that you have to reach the consumer public in order to be in the stream of commerce. So you don't need to certify it because the issue has already been told on how the Supreme Court is going to view the history of product liability law and what cases are instructive. What's your best case for the proposition that it has to end up in the hands of the consumer? Your Honor, from the Texas Supreme Court, I would go as far back as Armstrong Rubber. I see the language in Armstrong. Is it anywhere else or is that? Armstrong is not, I don't think, a Title VIII, Chapter 82 case, right? Right, Your Honor. But I would even go as far as- Common law background that we're talking about. Correct, Your Honor. Yes. Do you have a Chapter 82 case? Your Honor, this court's opinion in the Zari v. Pollard with the shower door display at- Okay, but that's us guessing. Nothing from the Texas Supreme Court? As far as ending up in the hands of the ultimate consumer, Your Honor? What I'm trying to get at is, is this an open question in Texas law? I understand that we've guessed it, but- Sure. I would argue that with Armstrong Rubber and everything informing those other more recent cases, like FFE Transport v. Holcomb, which- I guess what I'm asking is, is there a Texas Supreme Court case or a Texas case generally where this question was teed up? This question being, a product or an item didn't actually end up in the hands of the end user, the end consumer, and the court then had to decide, does Chapter 82 apply or not? Has that been teed up? No, Your Honor. I don't believe that exact situation has been off the top of my head. We're definitely guessing one way or the other. Whether we rule for you or your friend on the other side, we're making an eerie guess. Someway, Your Honor, we're guessing it. If we already made the eerie guess and there has not been an interview case in Texas that would change our previous eerie guess, is that your position? Yes, Your Honor. That there is no intervening case that would change the eerie guess we already made and it's close enough? Is that the previous eerie guess is close enough to this one? Yes, Your Honor. Amazon.com came out after the serving judgment was already entered in this case and it confirmed those cases that would apply here. And so we would argue, yes, that is close enough and we can apply the front deed. No, I'm talking about whether our circuit case- Oh, I apologize, Your Honor. Eerie works that we guess and then if the court who gets to decide, the Supreme Court of that state, says something afterwards that would cause us to question our guess, and it has to be pretty clear, but it would cause us to- If we're not sure, we have the option to certify. But if we think it's the same thing that we already decided and it doesn't change that, then we have to follow our own precedent. We can either certify or follow our own precedent. Those are our options. Do you get that? Yes, Your Honor, and I believe I misunderstood your initial question. I thought you were talking about the certification in Amazon.com versus McDonald's. No. I do believe that Missouri would be instructed there at the shower door display did reach that consumer public and led to the injury. Whereas here, that's not the case. This does not- So, yes, you could follow the eerie guess in Missouri to be the result to hold up the defense or not sellers because the terminals are not in the stream of commerce itself. Would it be wrong not to follow the eerie guess because there hasn't been an intervening Texas Supreme Court case that would say the other way? Yes, Your Honor, I believe you would want to follow your own previous precedents there. What about Fitzgerald? Where is that discussed? Your Honor, Fitzgerald is a different circumstance here. Did you discuss that? I do not believe so. No, it's not in the briefs, any of the red briefs. It's that I can find in the table of stories. It was only once in the blue brief, but now in the reply brief, it's four times and now the whole focus of the argument. So, you better discuss this case that is from the Texas Supreme Court that would overturn our eerie decision if indeed it was on point. Yes, Your Honor, and in Fitzgerald, the fundamental distinction there is that it was still the allegedly defective product, those spinal devices. While he was not in the chain of distribution because he was not the one who put that actual one into the person. That's different from here where we have the actual assemblies versus the term lists themselves. These are two different conceptual products that we're arguing about here today. And so, Fitzgerald made distinguishable on that point. For indemnity to be owed under prior liability law, it just makes sense that it has to be the actual defective product that is the item that you engage in the business of placing and distributing, and it actually reaches the stream of commerce. Fitzgerald, yes, the individual was not in the chain of distribution, per se, because of the actual specific spinal device. That's different from here where we're talking about the term list versus the actual assemblies themselves. He was in the business of putting the spinal devices into the stream of commerce, but that was the same product that was at issue in the underlying case. Not like here where we have the actual assemblies that are actually put in the stream of commerce or the auto parts versus the term lists, which are only used to secure that product during shipment. Drawing from different parts liability cases and other jurisdictions with Harmon Contract Glazing versus Boogie Owens, there's a distinction between the wooden crate that the glass panes were shipped in because that was designed to go to the ultimate consumer or the purchaser versus the bracing system that was used to secure it during transit. The bracing system itself was not an integral part of the product itself, while the crate was, and so here the terminals are much more like that bracing system. What about, okay, let's say if you're, you have to, we're putting, we're doing milk, and milk has to be put, it's put in bottles in between the farm and the plant where it's going to be pasteurized or whatever, and it's put in these glass bottles, and somebody's cutting themselves on these bottles when they inspect it at the farm inspection place by the government, you know, on the way. No, I'm just, and it's between, you know, Mississippi and Alabama or Texas and Arkansas or something, so that we got to, it went across the state line. In that case, the milk being taken from the farm in the milk bottle that has glass on it, but it's not being given to the consumer in those bottles, cartons, what say you? The owner, if the bottle itself is not going on to the ultimate consumer, it's going to be repackaged in the cartons, if I understand your question correctly. Yes, after the milk is pasteurized at the plant, it's going to be put in cartons, and I don't know if this could even work, but just, okay, go with me. Sure, no, your honor, I would argue that that is very similar to the place here, where they are simply used to help secure during transit and to provide a means of moving it from one point to the next, but when it's removed, that is not an integral part of the product. It's not a component part or anything that moves along with the milk as it moves forward here, and so the terminals would be the same way. It is removed and sent back to be reused again and they are the property of the Belkner Automotive, who purchases the axle assemblies. That's another key distinction, is that the Belkner Automotive. What's your best case that the milk person is also not responsible to the FDA worker who got cut? The milk worker is not also responsible? Okay, that the milk company that had the bottles that had the defective glass is not responsible. What is your best case? Under Texas or Fifth Circuit law? Both. Your honor, I'd go back to Armstrong Rubin, in that under Texas parcel liability law, which is cited by Amazon.com versus VidCon, that it has to reach that ultimate consumer, and that's not what happened here. There is a case from the Corpus Christi Court of Appeals, the Hernandez versus Southern Pacific Transport, where the railroad station used to secure items during transit, was not an intimate part of the product itself. It was only used to facilitate their own business purposes. In those instances, when it is an incidental part to a larger business enterprise, that is not the same as being engaged in the business of or reaching the stream of commerce, like it is here with the Termos shipping containers, that are not integral or they are not an incident. With that, as far as business being, the overall objective here is to purchase or to manufacture auto parts. That's the whole thing that this case is about. The Termos shipping containers are simply used to help secure them when Bentley Automotive says, I'm buying 100 axle assemblies, use my packaging to secure them, to send them to me because I want to make sure they get to me the right way. That's like if I go to the grocery store and bring my own bag, and I tell the cashier, hey, you don't need to bag this up in your own way. Use mine because I can get it all in one trip. It's a bigger bag. It doesn't follow that the grocery store would have to indemnify because I use my own product, my own property, my own bag. That's the same thing we're dealing with here with the Termos. The Texas Supreme Court's definition is very straightforward. It says the legislature is presumed to use a term knowing how the decisions have come out interpreting that term. Specifically with the stream of commerce, it's presumed that the legislature uses that term with the complete knowledge of the existing law and with reference to it. Concepts included in the seller definition have acquired particular meaning from our common cases. The definition of who constitutes a seller is similar. The Supreme Court, in answering the certified question here in Amazon.com versus McDonnell, said exactly what the standard is. This court, in certifying that question, acknowledged that you don't need to only sell products, but you have to release them in some manner to the consuming public, if that suffices. If there are no further questions, Your Honor, we would contend that you should affirm the summary judgment for these reasons because it is just an incidental part of a larger business enterprise and not an intimate integral part of the product itself. The defendants are not engaged in the business of placing and distributing the Termos in the stream of commerce, and the Termos themselves never entered the stream of commerce in this transaction. Thank you. Putting aside that Nazari is unpublished, what would you have us do with that case? Um, I don't think that Nazari is inconsistent with the positions that I'm taking. I think that Nazari has a lot of language and cites quite a bit of Texas case law, including Armstrong, on the point about ending, uh, the product that the, that the product has to end with the consumer or the user. I think that analysis was appropriate to the facts before the court in Nazari. Why isn't it a rule? We're looking for rules here. If it was a rule, if we treated that as being the exclusive commentary on Texas law, it would be inconsistent with the principle articulated in Fitzgerald. I also think that it would perhaps be inconsistent with what we now know, based upon the Texas Supreme Court's answer to the certified question at Amazon, where we talk about ordinary sales versus non-sale transactions. And what I, perhaps may be helpful is I'd like to try to draw, you asked the question I didn't just know, about the emphasis that the appellees are placing on 402A cases, as opposed to cases specifically dealing with Chapter 82. I want to draw the through line between the types of appellees we're making with respect to 402A, to the positions that were rejected in cases such as Fitzgerald. One of their arguments is that this distribution somehow is meaningful. If distribution is not somehow at issue, we, according to appellees, are just never going to get to seller status. Consider the following argument made by the dissent at page 869 in Fitzgerald. They wrote, the meaning of the statute before us does not plainly extend indemnity to a seller who is not in the marketing chain. Indeed, the statute indicates that the common law requirement that the seller must have sold the offending product to the third party survives. That is functionally indistinguishable from this notion that unless we were selling the thermos, we could never qualify for seller status. But it was the dissent in Fitzgerald who articulated that position. The majority said that is not an accurate statement of Texas law. What do you do with the center point builder's language that specifically says, as the district court quoted, no intermediary claimant's seller status is a necessary prerequisite to maintaining the claim. I think center point only characterizes the law when it comes to the private product services dynamic. Another lesson that we can extract from Fitzgerald is you have to look at the specific marketplace dynamics in a given case to understand whether or not a person qualifies for seller status based upon the specific marketplace dynamics and the actual criteria for seller status. What happens in our milk distribution case? My hypo. I disagree with the appellee's suggestion that if I am somewhere in an intermediate distribution of the milk and placing the milk in the glass packaging into the stream of commerce, I'm using the glass packaging. Well, is it in the stream of commerce if I'm just taking it back to my plant? Is that in the stream of commerce to be processed at my plant? I think it is being used in the stream of commerce, although I am not actually distributing it. But I'm never going to distribute those bottles and I'm only just, I need some mechanism to get it back to my plant. I think that's true, Your Honor, but that is the importance of the disjunctive distributing or otherwise. I think that's the important with Fitzgerald ruling that says you don't have to distribute the project. Your fingerprints cannot at all be on the defective product if you are a commercial actor who is in the business of moving products from commerce, and that goes back to the public policy consideration. What would be the utility as a matter of census law of saying, hey, we recognize that the public good is going to be served if we move the liability from the intermediate actor back to the manufacturer in the ordinary sale context and how that incentivizes the manufacturer, the prime mover, to do the things to preempt the product defect? What would be the utility of saying in that context, but if I use, use, unquestionably use some bracketing to move a product in the exact same way, you would say in that context, no, we're going to have the liability rest with the intermediate actor. We're going to, in essence, insulate the manufacturer from any accountability and from any incentive to do something about it in the first place. Well, we're not public policy makers from Texas or any other place. I agree with your response. I think the statute actually does that work for us so that the court does not. Thank you very much. We appreciate arguments on both sides. This case is submitted.